T.C. Memo. 2011-43

UNITED STATES TAX COURT

MICKA M. OLIVER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8527-09.                    Filed February 24, 2011.

Micka M. Oliver, pro se.

<u>Ric D. Hulshoff</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Petitioner did not file a Federal income tax
return for 2000, 2001, 2002, or 2004 (the tax years at issue).[1]
Thus, respondent created substitutes for returns on petitioner's

---

[1]Petitioner also did not file tax returns for 2005, 2006, or
2008.  Petitioner and her husband, Baron Oliver (Mr. Oliver),
filed a joint Federal income tax return for 2007.

behalf for the tax years at issue. See sec. 6020(b).[2]
Respondent issued a notice of deficiency in which he determined
Federal income tax deficiencies and additions to tax as follows:[3]

|      |            | Additions to Tax | | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654(a) |
|------|------------|-----------------|-----------------|--------------|
| 2000 | $2,996.00  | $674.10   | $749.00      | $161.14 |
| 2001 | 204.20     | 100.00    | 51.05        | -0-     |
| 2002 | 25,478.00  | 5,732.55  | 6,369.50     | 851.43  |
| 2004 | 3,329.00   | 749.03    | [1]TBD       | -0-     |

[1]Amount to be determined under sec. 6651(a)(2).

Petitioner timely filed a petition with this Court. At the time
of filing the petition and during all years at issue, petitioner
was married to Baron Oliver (Mr. Oliver),[4] and both she and Mr.
Oliver resided in Arizona.[5] In an amendment to the answer,

_____

[2]Unless otherwise indicated, all section references are to
the Internal Revenue Code of 1986, as amended and in effect for
the tax years at issue, and all Rule references are to the Tax
Court Rules of Practice and Procedure.

[3]The notice of deficiency also reflected respondent's
determinations that: (1) Petitioner's filing status for the tax
years at issue was married filing separate, (2) petitioner was
entitled to the standard deduction for the tax years at issue,
(3) petitioner was entitled to one personal exemption for the tax
years at issue, and (4) petitioner was entitled to a rate
reduction credit for 2001.

[4]Petitioner and Mr. Oliver had been married to each other
for over 40 years at the time of trial.

[5]Arizona is a community property State. See Ariz. Rev.
Stat. Ann. sec. 25-211 (2004). The Olivers did not execute a
premarital agreement even though Mr. Oliver considered all income
to be his.

respondent asserted increased deficiencies[6] and additions to tax for the tax years at issue that were based upon alleged community property income not included in the notice of deficiency.[7]  After the asserted increases, the deficiencies and additions to tax were as follows:[8]

|      |            | Additions to Tax | | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654(a) |
|------|------------|-----------------|-----------------|--------------|
| 2000 | $4,885.00  | $1,099.13       | $1,221.25       | $262.75      |
| 2001 | 7,112.20   | 1,600.20        | 1,778.00        | 284.20       |
| 2002 | 37,940.00  | 8,536.50        | 9,485.00        | 1,267.86     |
| 2004 | 11,884.00  | 2,673.90        | 2,971.00        | 340.58       |

Respondent has since conceded many items in the notice of deficiency and the amendment to the answer.[9]  After concessions, the issues for decision are:  (1) To what extent, if any,

---

[6]The asserted increase in petitioner's 2001 deficiency contained in the amendment includes a minor mathematical error when compared with Form 5278, Statement--Income Tax Changes.

[7]The amended answer specifically asserted that, in accordance with Arizona law, petitioner must include in income her community property share of:  (1) Social Security benefits she received during the tax years at issue, (2) retirement account distributions Mr. Oliver received during the tax years at issue, and (3) Social Security benefits Mr. Oliver received during the tax years at issue.

[8]The amendment to the answer also asserted that the Court should disallow the standard deduction afforded to petitioner in the notice of deficiency.  See supra note 3.

[9]Specifically, respondent has conceded petitioner's liability for additions to tax under secs. 6651(a)(2) and 6654. See infra note 28.  Respondent's amendment to the answer also contained minor mathematical errors relating to these penalties. As respondent has conceded petitioner's liability for these penalties, the errors have no bearing on the outcome of this case.

petitioner must include in her income wages, dividends, and Social Security benefits Mr. Oliver received in 2000; wages, unemployment compensation, and Social Security benefits he received in 2001; unemployment compensation and Social Security benefits he received in 2002; and Social Security benefits he received in 2004; (2) to what extent, if any, petitioner must include interest income the Olivers received in 2001 and 2002 and gain on the sale of stock the Olivers received in 2002; (3) to what extent, if any, petitioner must include proceeds the Olivers received in 2002 pursuant to a settlement agreement; (4) to what extent, if any, petitioner must include in income her Social Security benefits she received during the tax years at issue; (5) to what extent, if any, petitioner must include in income proceeds from the sale of real estate in 2004; (6) whether petitioner's filing status for the tax years at issue was married filing separate; (7) whether petitioner was entitled to the standard deduction for the tax years at issue; (8) whether petitioner was entitled to one personal exemption for the tax years at issue; and (9) whether petitioner is liable for additions to tax under section 6651(a)(1) for failure to file Federal income tax returns.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and the attached exhibits are incorporated in the

- 5 -

Court's findings by this reference. Petitioner did not work during the tax years at issue. She received Social Security disability benefits during those years of $9,690, $10,056, $10,296, and $10,663, respectively.

During 2000 and part of 2001 Mr. Oliver worked for Qwest Corp. (Qwest). During those years he received from Qwest wages of $52,834 and $14,561, respectively. In 2000 he also received dividends of $27. In 2001 he received unemployment compensation of $2,870. In 2002 Mr. Oliver received $5,125 in unemployment compensation and $23,546 in Social Security benefits. In 2004 he received $20,971 in Social Security benefits.

Throughout 2000 and 2001 and until April 2002 the Olivers were engaged in a lawsuit they had filed against Qwest in 1997.[10] In April 2002 the Olivers reached a settlement with Qwest, which was memorialized in part by a Settlement Agreement and Release of All Claims (settlement agreement). The settlement agreement provided that: (1) The Olivers would dismiss or withdraw any pending lawsuits or administrative proceedings and release all claims against Qwest, and (2) Qwest would pay the Olivers $201,000 "for alleged personal injuries, including emotional distress and compensatory damages; no portion of which represents payment of back, severance or front pay or lost benefits."

_____

[10]Both petitioner and Mr. Oliver were plaintiffs in the lawsuit.

Pursuant to the settlement agreement, the Olivers received a $201,000 check from Qwest in 2002, which they deposited into a savings account.[11]

Either petitioner or Mr. Oliver[12] received interest income of $40 in 2001 and $958 in 2002. Also in 2002 petitioner or Mr. Oliver received $3,958 from the sale of Qwest stock.[13]

During 2004 the Olivers sold real estate in Lawton, Oklahoma, for $65,000. Fourteen years earlier, when petitioner's mother owned the real estate, she, petitioner, and Mr. Oliver executed a contract for deed, which provided in relevant part that: (1) The Olivers would assume the then-existing mortgage on the real estate, (2) petitioner's mother would execute a warranty deed conveying to the Olivers title to the real estate,[14] (3) an escrow agent would hold the deed until the Olivers fully paid the mortgage and, (4) if and when the Olivers fully paid the

---

[11]The Olivers used the settlement proceeds to purchase vehicles, build a home in Arizona, and repair real estate in Oklahoma.

[12]The Court need not determine which of the Olivers received the income. The mere fact that one of the Olivers received the income allows the Court to dispose of all relevant issues involving this fact.

[13]Respondent concedes that the cost basis of the Qwest stock sold was $3,544. Thus, the gain on the sale was $414. Again, the Court need not determine which of the Olivers received the proceeds from the stock sale. See supra note 12.

[14]Petitioner's mother executed the warranty deed in December 1990.

mortgage, the escrow agent would deliver the deed to the Olivers. The contract also provided: "It is understood and agreed between the parties this instrument is a contract for deed, and that * * * [the Olivers] shall not acquire an interest in the above described property until terms of this contract are met".

Petitioner's mother's last will and testament was signed and witnessed contemporaneously with the contract for deed. The will devised the real estate "unto * * * [her] daughter, Micka Oliver." Petitioner's mother passed away before or during 1994.[15] Petitioner, in her capacity as heir, filed a petition to probate her mother's will in Oklahoma State court. Petitioner's sister then petitioned the court to avoid probate and to set aside the deed and the contract for deed. The Olivers had not completed the terms of the contract before petitioner's mother's death,[16] nor had the escrow agent released any of the title documents. Petitioner and her sister eventually settled the matter and executed an agreement, which they filed with the Oklahoma court clerk on September 20, 1995 (will contest

---

[15]The record does not reflect the exact date petitioner's mother passed away. However, the probate number "P-94-18" appeared on documents in a petition petitioner's sister filed to contest the will. Furthermore, petitioner produced a bill from an attorney with dates in 1994 on which he handled matters regarding the probate of her mother's will.

[16]Petitioner produced checks showing payments the Olivers made to the mortgage company as late as November 1995 and during the course of the probate and will contest.

agreement). The will contest agreement, however, reflected neither the provision in the will regarding the real estate nor the terms of the 1990 contract for deed. Rather, it stated that the parties agreed that the contract and deed <u>properly transferred and conveyed</u> the real estate to the Olivers.[17] The will contest agreement also provided that the escrow agent would deliver the deed to petitioner.

Petitioner filed the will contest agreement, and that same day the Olivers executed another agreement to assume the then-remaining amount of the mortgage. The Olivers paid the mortgage until sometime in 2001, when they made the final mortgage payment on the real estate.

When petitioner sold the real estate in September 2004, the buyers signed a promissory note, which obligated them to make 360 monthly payments of $335.51 "to the order of Baron Leone Oliver and Micka Maria Oliver".[18] The principal amount of the promissory note was $62,500. The first monthly payment was due October 1, 2004; all subsequent payments were due the first of

---

[17]Nothing in the will contest agreement, the will, or the contract for deed reflects or approximates the real estate's value on the day the will and the contract for deed were executed. Nor does the record reflect the real estate's value on the date petitioner's mother passed away. Petitioner produced part of a 1994 appraisal, but it did not show the appraised value of the real estate.

[18]Each payment included principal and interest. The interest rate was 5 percent.

each month, with the last payment due September 1, 2034. The buyers signed a payment letter stating the details of the October 2004 payment. The letter also stated: "Your loan will be serviced by Baron Leone Oliver and Micka Maria Olviver [sic]." In addition, the letter instructed the buyers to mail each monthly payment to both petitioner and Mr. Oliver.

To provide security for their obligation, the buyers executed a mortgage on the real estate, which listed the Olivers as mortgagee. The Olivers and the buyers also executed a joint tenancy warranty deed and a real estate purchase contract. The real estate purchase contract provided, among other things, that the buyers would pay $2,500 earnest money, which would be deposited with Oklahoma Abstract Co.

By the end of 2004 the Olivers had received the earnest money and three installment payments totaling $1,006.53. Respondent has conceded that the basis of the real estate on the date of sale was $30,000.

OPINION

I. Community Property Assets

A. Wages, Dividends, and Unemployment Compensation

Respondent determined that, in accordance with Arizona law, petitioner must include in income her community property share of wages and dividends Mr. Oliver received in 2000, wages and unemployment compensation he received in 2001, and unemployment

compensation he received in 2002. Arizona law presumes that property acquired by one spouse during marriage is community property unless acquired: (1) By gift, devise, or descent; or (2) after service of a petition for divorce, separation, or annulment. Ariz. Rev. Stat. Ann. secs. 25-211, 25-213(A) and (B) (2004); Rundle v. Winters, 298 P. 929, 931 (Ariz. 1931). To rebut the presumption, a taxpayer must produce clear and convincing evidence that the property at issue is separate property. Rundle v. Winters, supra at 931. This evidence can include a validly executed premarital agreement designating certain property to be separate property. See Ariz. Rev. Stat. Ann. sec. 25-203(A)(1), (2), and (3) (2004).

The Olivers were married during the tax years at issue. Mr. Oliver admitted that he received wages, dividends, and unemployment compensation during the years and in the amounts respondent determined. Thus, the Court presumes those income items are community property. While Mr. Oliver believes all income received is his alone, the Olivers never executed a premarital agreement of any kind. Petitioner produced no additional evidence to rebut the Arizona community property presumption but merely asserted that Arizona community property law should not apply to them. Therefore, the Court holds that petitioner must include in income her community property share of Mr. Oliver's wages, dividends, and unemployment compensation.

B. Social Security Benefits

Respondent's amended answer affirmatively asserted that Mr. Oliver's Social Security benefits received during the tax years at issue must be included in income as petitioner's share of community property. Respondent must prove this affirmative allegation. See Rule 142(a)(1). Respondent has since abandoned this allegation, stating in the alternative that Social Security benefits are a spouse's separate property and, as such, not includable in petitioner's income.[19] Therefore, petitioner need not include in income the Social Security benefits Mr. Oliver received during the tax years at issue.

II. Interest Income and Gain From the Sale of Stock

Respondent determined that petitioner should include in income her community property share of interest income either she or Mr. Oliver received in 2001 and 2002, as well as her community property share of gain on stock either she or Mr. Oliver sold in 2002. The Olivers admitted that they received the interest income and gain from the stock sale during the years and in the amounts respondent determined. Because they were married during those years, the community property presumption applies. See Ariz. Rev. Stat. Ann. sec. 25-211; Rundle v. Winters, supra at 931. Mr. Oliver believed that all income was his, and petitioner's position was that community property law should not

[19]Petitioner agrees with respondent's modified position.

apply; but petitioner produced no evidence to rebut the presumption. Therefore, the Court holds that petitioner must include in income her community property share of the interest income and the gain from the stock sale.

III. <u>Proceeds From the Qwest Settlement Agreement</u>

Respondent determined that petitioner should include in income her community property share of cash proceeds the Olivers received in 2002 pursuant to the settlement agreement with Qwest. In this instance, the community property presumption does not apply; rather, recovery for personal injuries includes components, some of which constitute separate property. <u>Jurek v. Jurek</u>, 606 P.2d 812, 813-814 (Ariz. 1980). Specifically, the part classified as compensation for injuries to one spouse's "personal well-being" are that spouse's separate property. <u>Id.</u> at 814. The parts classified as compensation for lost wages or medical expenses, however, are community property. <u>Id.</u>

The settlement agreement provided a lump-sum recovery for Mr. Oliver's personal injuries, including emotional distress. Such injuries clearly represent injuries to Mr. Oliver's personal well-being. Furthermore, the settlement agreement specifically excluded lost wages from the recovery. Lastly, petitioner produced no evidence that the Olivers incurred any medical expenses as a result of Mr. Oliver's injuries. Thus, the Court finds that the settlement proceeds are Mr. Oliver's separate

property. Therefore, the Court holds that petitioner need not include in her income any proceeds Mr. Oliver received pursuant to the settlement agreement.

IV. Petitioner's Social Security Benefits

Respondent asserted in his amended answer that petitioner must include in income her community property share of Social Security benefits she received during the tax years at issue. As with his previous affirmative allegation, respondent bears the burden of proof. See Rule 142(a)(1). Respondent abandoned this initial allegation, arguing that the Social Security benefits petitioner received are her separate property, the entirety of which is includable in petitioner's income.

Petitioner admitted that she received Social Security disability benefits during the tax years at issue in the amounts respondent determined. Arizona law provides that Social Security benefits paid to one spouse are that spouse's separate property. Luna v. Luna, 608 P.2d 57, 60 (Ariz. Ct. App. 1979). Thus, the Social Security benefits petitioner received were her separate property. Therefore, the Court holds that petitioner must include in income the entire amount of Social Security benefits she received during the tax years at issue.

V. Sale of the Lawton, Oklahoma, Real Property

Respondent determined that petitioner should include in income her community property share of the entire gain from the

sale of the real estate. The Court disagrees and holds that (1) the real estate was petitioner's separate property, (2) petitioner sold the real estate on the installment method, (3) petitioner must include in income the capital gain portion of the earnest money received in 2004, (4) petitioner must include in income her community property share of the capital gain received in 2004 pursuant to the promissory note, and (5) petitioner must include in income her community property share of the interest income received in 2004 pursuant to the promissory note.

The real estate was petitioner's separate property. In Oklahoma, if a contract and deed are executed as part of the same transaction and delivery of the deed is only part performance of the contract's terms, the contract does not merge into the deed. Banks v. City of Ardmore, 112 P.2d 372, 376 (Okla. 1941). Here, the deed and contract for deed were executed the same day. The contract unambiguously provided that the Olivers would not obtain any interest in the real estate until they made full payment under the contract. Furthermore, only upon full payment would the escrow agent deliver the deed to the Olivers. Thus, the contract did not merge into the deed. Because the Olivers had not made full payment pursuant to the contract before petitioner's mother passed away, neither execution of the deed in 1990 nor delivery of the deed in 1995 conveyed any interest in the real estate to either of the Olivers. Rather, delivery in

1995 completed the devise of the real estate to petitioner under her mother's will.[20]  The Arizona community property presumption does not apply to property received by devise.  See Ariz. Rev. Stat. Ann. secs. 25-211, 25-213(A).  Therefore, when petitioner received the real estate in 1995, it was her separate property.

Petitioner's separate property retains its status unless changed by agreement or operation of law.  See Sims v. Hanrahan, 475 P.2d 505, 506 (Ariz. Ct. App. 1970).  Between 1995 and 2004 petitioner could have conveyed the real estate to Mr. Oliver as his separate property or to both herself and Mr. Oliver as community property.  See Tyson v. Tyson, 149 P.2d 674, 678 (Ariz. 1944); Ariz. Cent. Credit Union v. Holden, 432 P.2d 276, 279 (Ariz. Ct. App. 1967).  The Olivers' intent, established by a conveyance and the surrounding facts, would control.  See Ariz. Cent. Credit Union v. Holden, supra at 279.  Petitioner never conveyed the real estate to Mr. Oliver or to herself and Mr. Oliver after she received the real estate in 1995.  Accordingly, the Court holds that the real estate was petitioner's separate property when she sold it in 2004.

The sale of the real estate in 2004 qualified as an installment sale.  Thus, interest income and capital gain received in 2004 must be reported using the installment method. An installment sale is a disposition of property where at least

---

[20]Delivery occurred pursuant to the will contest agreement.

one payment will be received after the year of sale.  Sec.
453(b)(1).  The seller must report income received from an
installment sale under the installment method unless she
affirmatively elects not to do so.[21]  Sec. 453(a), (d)(1).
Petitioner sold the real estate for $65,000, receiving earnest
money of $2,500 and a promissory note in the amount of $62,500,
executed by the buyers, which provided that the buyers would make
monthly payments well after 2004, with the last payment being due
in 2034.  Petitioner did not elect to report the sale under a
method other than the installment method.  Therefore, the Court
holds that petitioner sold the real estate on the installment
method.

Under the installment method, the seller recognizes capital
gain as installment payments are received.  Sec. 453(c).  Each
installment payment consists of three portions:  (1) Recovery of
basis, (2) capital gain, and (3) interest.  In a given year, the
seller is taxed only on the gain and interest income received

---

[21]Respondent argues that petitioner should not be allowed to
report the sale on the installment method simply because, to
date, petitioner has not reported any gain from the sale.
Respondent's argument has no merit.  The statutes, caselaw, and
regulations governing installment sales clearly make installment-
method reporting the default method absent an affirmative
election.  See sec. 453(d)(1); Bolton v. Commissioner, 92 T.C.
303, 306 (1989); sec. 15a.453-1(d)(1), Temporary Income Tax
Regs., 46 Fed. Reg. 10717 (Feb. 4, 1981).  Notably, respondent
provides no legal authority to support his argument.

during that year.[22]  To determine the capital gain, the seller

multiplies the total amount of payments received during the year

by the gross profit ratio.  Id.  The gross profit ratio[23] equals

the gross profit from the sale divided by the total contract

price.  Id.  The gross profit equals the selling price minus the

seller's adjusted basis in the property.  Sec. 15a.453-

1(b)(2)(v), Temporary Income Tax Regs., 46 Fed. Reg. 10710 (Feb.

4, 1981).  The selling price equals the total consideration the

seller receives for the property, including:  (1) Any money and

the fair market value of any property received; (2) any mortgage

or other debt the buyer pays, assumes, or takes subject to;[24] and

(3) any selling expenses the buyer pays.  Sec. 15a.453-

1(b)(2)(ii), Temporary Income Tax Regs., 46 Fed. Reg. 10709 (Feb.

4, 1981).

The selling price and total contract price equaled $65,000.

Petitioner's adjusted basis in the real estate, as respondent

conceded, was $30,000.[25]  Thus, the gross profit on the sale

---

[22]The interest income is ordinary income.  Sec. 61(a)(4).
The gain recognized is capital gain.  Secs. 1001, 1221(a); see
also sec. 1(h) (prescribing the maximum capital gains rate).  The
recovery of basis is nontaxable.  See sec. 1001(a).

[23]The gross profit ratio is also referred to as the gross
profit percentage.

[24]The record contains no evidence that, on the date of sale,
the property was subject to any qualified indebtedness.

[25]Petitioner claims that the adjusted basis was equal to the
(continued...)

equaled $35,000. In 2004 petitioner received $2,500 earnest money and three installment payments of $335.51 pursuant to the promissory note. The earnest money consisted of nontaxable recovery of basis and taxable capital gain. Each installment payment consisted of nontaxable recovery of basis and taxable capital gain and interest income.

The status of the real estate as petitioner's separate property became fixed at the time she acquired it.[26] See Horton v. Horton, 278 P. 370, 371 (Ariz. 1929). Thus, petitioner, as the sole owner of the real estate, was entitled to treat all capital gain from the sale in 2004 as her separate property. See id. However, if spouses treat income (or gain) from separate property as community property and they intend for the income to become community property, the character of the income changes accordingly. Rundle v. Winters, 298 P. at 931.

In 2004 petitioner received earnest money and three installment payments. The capital gain portion of the earnest

_____

[25](...continued)
fair market value on the date she sold it in 2004. Petitioner produced no evidence to substantiate her claim. Thus, the Court finds that petitioner's adjusted basis is $30,000, as respondent conceded.

[26]Petitioner testified that the Olivers paid expenses for repairs, maintenance, and improvements between 1995 and 2004. However, petitioner produced no evidence to substantiate such expenses. Furthermore, even if the Olivers did pay such expenses, doing so would not make the real estate community property. See Horton v. Horton, 278 P. 370, 371 (Ariz. 1929).

money and of each installment payment would ordinarily constitute income from petitioner's separate property. The documents surrounding the installment sale, however, evince clear intent for the three installment payments to be community property. The promissory note required the buyers to make payments "to the order of" both petitioner and Mr. Oliver, the mortgage listed the Olivers as mortgagees, and the payment letter stated that the Olivers would service the loan. Thus, the Court finds that the Olivers intended the installment payments to become community property. Therefore, the Court holds that petitioner must include in income her community property share of the capital gain received in 2004 pursuant to the promissory note. However, the record contains no evidence of such intent regarding the earnest money. Therefore, the Court holds that petitioner must include in income the capital gain portion of the earnest money received in 2004 as her separate property.

Petitioner must also include in income her community property share of interest received in 2004 pursuant to the promissory note. The Olivers received the interest income solely because they executed an installment sale agreement and charged interest.[27] Because the Olivers received the interest income while they were married, the community property presumption

---

[27]In other words, the nature of the property sold--appreciated real estate--did not affect the Olivers' receipt of interest income.

applies.  See Ariz. Rev. Stat. Ann. sec. 25-211; <u>Rundle v.</u>
<u>Winters</u>, <u>supra</u> at 931.  Petitioner offered no evidence to rebut
the presumption.  Therefore, the Court holds that petitioner must
include in income her community property share of the interest
income the Olivers received in 2004.

VI. <u>Filing Status, Standard Deduction, and Personal Exemption</u>

Respondent determined that petitioner's filing status for
the tax years at issue was married filing separate.  The Olivers
were married throughout the tax years at issue.  To claim married
filing joint return filing status, however, the Olivers needed to
file valid joint tax returns either before or after respondent
issued the notice of deficiency.  See <u>Millsap v. Commissioner</u>, 91
T.C. 926, 936-937 (1988).  The Olivers did not file valid, signed
joint tax returns for the tax years at issue.  Therefore, the
Court holds that petitioner's filing status for the tax years at
issue was married filing separate.

In addition, respondent determined that petitioner was
entitled to the standard deduction for the tax years at issue.  A
taxpayer is entitled to the standard deduction if she does not
itemize deductions.  Sec. 63(b).  To itemize deductions, a
taxpayer must affirmatively elect to do so on her Federal income
tax return.  Sec. 63(e)(1) and (2).  Petitioner did not file
returns for the tax years at issue, and thus she cannot itemize

deductions.  Therefore, the Court holds that petitioner was entitled to the standard deduction for the tax years at issue.

Furthermore, respondent determined that petitioner was entitled to one personal exemption for the tax years at issue.  A taxpayer may claim one exemption for herself during a given tax year.  Sec. 151(a) and (b).  She may also claim an exemption for her spouse if, among other things, her spouse had no gross income for that tax year.  Id.  Mr. Oliver, however, had gross income for each tax year at issue.  Thus, petitioner cannot claim an exemption for Mr. Oliver for those tax years.  Therefore, the Court holds that petitioner was entitled to only one personal exemption for the tax years at issue.

VII. Addition to Tax for Failure To File Tax Returns

Respondent determined that petitioner is liable for additions to tax for failing to file tax returns for the tax years at issue.[28]  See sec. 6651(a)(1).  Respondent must produce sufficient evidence to show that imposing this addition is appropriate.  See sec. 7491(c); Wheeler v. Commissioner, 127 T.C. 200, 206 (2006) (citing Higbee v. Commissioner, 116 T.C. 438, 446 (2001)), affd. 521 F.3d 1289 (10th Cir. 2008).  Petitioner may avoid these additions by establishing that she had reasonable

---

[28]Initially, respondent determined that petitioner is also liable for additions to tax under secs. 6651(a)(2) and 6654. Respondent has now conceded that petitioner is not liable for these additions to tax.  See supra note 9.

cause for failing to file and that her failure did not result from willful neglect. See sec. 6651(a)(1); <u>Wheeler v. Commissioner</u>, <u>supra</u> at 207; <u>Higbee v. Commissioner</u>, <u>supra</u> at 447.

Petitioner admitted that she did not file tax returns for the tax years at issue. She also produced no evidence to establish that she had reasonable cause for her failure to file and that her failure did not result from willful neglect.[29] Therefore, the Court holds that petitioner is liable for the additions to tax.

The Court has considered all arguments for contrary holdings and, to the extent not discussed above, finds those arguments to be without merit.

To reflect the foregoing and concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[29]Petitioner did testify that she had health problems during the tax years at issue. However, she has consistently argued that she was not required to file tax returns. She has not, before doing so in her answering brief, argued that her health problems impeded her ability to file returns. Thus, the Court finds that petitioner's health problems had no effect on her ability or failure to file returns for the tax years at issue.